## WHITING MANUFACTURING COMPANY v. CAROLINA ALUMINUM COMPANY.

(Filed 19 September, 1934.)

1. **Eminent Domain B b—Defendant hydroelectric company held to have power of eminent domain to acquire lands for generation of electricity.**

   Where a corporation is authorized by its charter to generate and sell electricity, build dams and hydroelectric plants necessary to the generation of such hydroelectric power, and is therein given power of eminent domain to acquire the necessary rights of way and lands for its dams and the ponding of water if it could not agree with the owners of such lands upon a purchase price, and in pursuance of its charter powers such corporation builds hydroelectric plants and generates and sells electricity to municipalities and individuals as well as electric power to private manufacturing plants, such corporation is a public-service corporation and has the power of eminent domain, N. C. Code, 1705, 1706, and it cannot be successfully contended that its taking of lands for ponding water necessary for one of its dams is a taking of private lands for a private use, N. C. Constitution, Art. I, sec. 17, Federal Constitution, 14th Amendment, sec. 1, nor does the fact that such public-service corporation also engages in private enterprises not connected with its public service alter this result.

2. **Eminent Domain D a—Defendant held estopped to complain that regular condemnation proceedings were not had by plaintiff.**

   Where a power company has the right of condemning lands by a certain method prescribed by statute and its charter, but title to certain land covered by its ponded water is in dispute between it and one claiming title, and such land is covered by its ponded water for a number of years and claimant repeatedly refuses to sell until other unrelated disputes between it and the power company are settled, and in an action in ejectment by the power company in which it prays that if it be determined that defendant is the owner of the land, permanent damages be assessed and it be given title to the property, the defendant fails to demand that the land be regularly condemned, but demands damages for trespass, and acquiesces in a jury trial, the defendant is estopped to complain that plaintiff did not pursue the method of condemnation prescribed by statute and its charter.

**3. Eminent Domain C e—Measure and amount of damages for taking of lands under the power of eminent domain.**

> Where an electric power company, under the power of eminent domain, has erected a permanent dam that has ponded water back upon the lands of a private owner, the measure of damages recoverable by the owner is the fair market value of the land so taken at the time of the taking, in arriving at which the jury may consider the value of the land in connection with all the uses to which it could have been reasonably put, and not exclusively its value for the purpose for which it was used by the owner at the time of the taking, it being the object of the law to fully compensate the owner for his lands, and the charge of the trial court to the jury on the issue of damages in this case is held to be without error.

APPEAL by plaintiff from *McElroy, J.,* and a jury, at March Term, 1934, of GRAHAM.   No error.

This is an action of ejectment, brought by plaintiff, a corporation, against defendant, a corporation, to recover possession of about one acre of land in Graham County, North Carolina, on Snowbird River, in the shape of a triangle.   The plaintiff alleged that it was the owner of the land and defendant is in the wrongful possession of same.   The defendant denied that plaintiff was the owner and set up as a defense certain statutes of limitation.   The defendant, as a further defense, set up the following: "(1) The defendant, the Carolina Aluminum Company (formerly the Tallassee Power Company), is a corporation, created by the act of the General Assembly of North Carolina, chapter 122 of Private Acts of 1905, and duly organized thereunder; that among other rights, powers, and privileges conferred by said act of the Legislature this defendant was given the right to own, construct and develop and operate dams and water powers, with all the rights and privileges incident thereto, including the right of eminent domain for condemning land for the ponding of water and other purposes, which charter or act of the Legislature is referred to as fully as if written herein, and asked to be made a part of this answer.   (2) This defendant says that it is informed and believes that in the event the plaintiff establishes a superior title to that portion of the lands described in the complaint, which is claimed by the defendant, or if it establishes damages thereto, that it has the right to have said land condemned in this action, and permanent damages assessed by the jury in this action for the value of that portion of the property which is claimed by the defendant if the plaintiff establishes superior title thereto; and this defendant here elects that should plaintiff establish its right to the portion of the land claimed by the defendant, that permanent damages be assessed therefor.

"Wherefore, having fully answered, defendant prays that the action be dismissed and that it go without day and recover its cost; or, in the event that plaintiff establishes superior title to the portion of the land

described in the complaint, claimed by the defendant, that the same be condemned and permanent damages assessed therefor in this action."

The defendant also, in a supplemental answer, set up a contract between the two corporations (Tallassee Power Company, predecessor in title), in which certain things were to be done by each corporation, and that in the contract it had a right to purchase the land at $10.00 an acre. The plaintiff made reply denying the material allegations of the defense of defendant corporation, and set up the following: "That it is advised, informed, and believes that the defendant was not at the time of the trespass and is not now a public-service corporation, and had not then nor has it yet complied with or brought itself within the requirements and provisions of the Constitution, and the laws of North Carolina made in pursuance thereof, to justify and invest in it the right and power of eminent domain; that the defendant is, in reality, and was at the time of the trespass, existing, acting, and doing business only as auxiliary corporation of the Aluminum Company of America, which is a corporation of some foreign state, and wholly concerned and employed in strictly private business and enterprise and not public service, and plaintiff says to allow the defendant to take plaintiff's property under the guise of a public-service corporation, as it seeks to do, would be taking private property for a private use and without due process of law, in contravention and against the provisions of section 1 of the 14th Amendment of the Constitution of the United States of America and Article I, section 17, of the Constitution of the State of North Carolina, and the laws thereof."

The plaintiff, also in reply to defendant's supplemental answer, says that the contract referred to of 5 October, 1917, expired and became inoperative after 1 May, 1920. The plaintiff further says: "However, if the court should hold that the defendant is entitled to have plaintiff's land condemned and permanent damages assessed, which right this plaintiff denies, then this plaintiff would show the court further and asks leave to amend its complaint by supplementing and adding thereto the following paragraph, to wit:

"That the plaintiff's lands described in the complaint is situated on and covers and embraces a large scope of Big Snowbird River, which river, on account of its geographic location, its large volume of water, rapid and average flow, and other attendant facilities, made it favorably adaptable and highly suitable and valuable for potential water power, and plaintiff's said land was, in addition to the other valuable and adaptable use, of great and high value as a water power proposition, etc.

"The defendant, well knowing the location, boundary, and title of plaintiff's land before and at the time it completed its lake and appro-

priated the same, made no effort whatever to purchase said land from the plaintiff, or to procure its consent for its use, and that if the defendant contends that it had the right of power of eminent domain at that time, plaintiff alleges and shows to the court that it made no attempt or effort whatever to exercise such right as prescribed by the laws of the State of North Carolina, but that it, without the knowledge or consent of plaintiff, chose to confiscate or take the same without purchase or due process of law."

After setting forth other matters, the plaintiff made the following prayer: "Wherefore, plaintiff prays judgment of the court against the defendant: (1) For relief of ejectment of defendant from its land as demanded in the complaint. (2) For $750.00 for amount due by defendant for rental value of said land. (3) If the court should hold that defendant has the right to condemn and appropriate the plaintiff's land, then plaintiff demands judgment for: (a) $4,000 permanent damages; (b) $500.00 as punitive damages; (c) for the costs of this action and such other and further relief and remedies in the premises as to the court may seem just and proper."

The defendant, in reply, among other things, says: "That the said plaintiff, as this defendant is advised and believes, has sold and conveyed to the Champion Fibre Company, under deed dated 19 December, 1926, and recorded in the office of the register of deeds of Graham County, North Carolina, in Book 36, page 1, all of the exclusive rights, privileges, and easements conveyed to it under said contract between it and the defendant, thereby creating a continual or perpetual right or easement to it or its grantees, to the use of said water in said reservoir for transportation purposes."

The defendant makes the following prayer: "Wherefore the defendant prays judgment: (1) That the court order specific performance by the plaintiff of each and every of the terms of the contract of 5 October, 1917, providing for the conveyance of any lands owned by the plaintiff which have not heretofore been conveyed to the defendant at the price of $10.00 an acre, be complied with. (2) That the court decree that the plaintiff is estopped by its contract and by its acts and conduct from demanding from the defendant a greater sum than $10.00 per acre for any lands owned by it that may be overflowed by the waters impounded by the Melton or Santeetlah Dam, and that it be required to execute deed therefor upon the payment, or tender, to it of the sum of $10.00 per acre for all such lands to which it held title at the date of the commencement of this action."

The plaintiff replies to this and sets up a letter dated 11 May, 1928, from an agent of defendant, requesting extension of the contract of 5 October, 1917, which plaintiff refused on 18 May, 1928, contending the contract expired 1 May, 1920.

The following issues were submitted to the jury by the court below, and their answers thereto: "(1) Is the plaintiff the owner of that portion of the land described in the complaint shown on the map from B to 2 and from 2 to 7, 7 to 8, and from 8 back to B, which is now in the possession of the defendant?   A. 'Yes.'   (2) Is the defendant in the unlawful and wrongful possession of said land?   A. 'Yes.'   (3) If so, is the plaintiff required under the terms of the contract to convey said land to the defendant at $10.00 per acre?   A. 'No.'   (4) Is the plaintiff estopped under the terms of its contract and by its acts and conduct to charge the defendant more than $10.00 per acre?   A. 'No.'   (5) Is the plaintiff, under its contract with the defendant and by its acts and conduct, estopped to assert its right to the possession of said land?   A. 'No.'   (6) What permanent damages, if any, is the plaintiff entitled to recover of the defendant for the lands in question?   A. '$350.00.'"

The court below rendered judgment in accordance with the verdict and in the judgment is the following: "It is thereupon considered, ordered, adjudged, and decreed by the court that the defendant, Carolina Aluminum Company, upon the payment into court of the sum of $350.00, together with the costs of this action, be and it is hereby vested with a permanent easement, with the right of possession for the purpose of flooding that part of plaintiff's land shown on the court map and lying within the lines indicated: Beginning at the letter B and running thence to the figure 2; thence from figure 2 to figure 7; thence from figure 7 to figure 8; thence from figure 8 to the letter B, the point of beginning, so long as the said defendant, Carolina Aluminum Company, its successors or assigns, shall use said lands in connection with the development, production, and use of hydroelectric power generated by its Santeetlah hydroelectric development in Graham County."

The plaintiff made numerous exceptions and assignments of error, and appealed to the Supreme Court. The necessary ones and material facts will be set forth in the opinion.

*T. M. Jenkins for plaintiff.*
*S. W. Black, Moody & Moody, and R. L. Smith & Son for defendant.*

Clarkson, J.   The charter of the Tallassee Power Company, which was pleaded by defendant, is set forth in chapter 122, Private Laws of 1905.   An amendment changed the name to the Carolina Aluminum Company.   The charter, among other provisions, contains the following: "Sec. 4. That said company is authorized and empowered to supply to the public, including both individuals and corporations, whether private or municipal, within the State of North Carolina and elsewhere, power in the forms of electric current, hydraulic, pneumatic, and steam pressure, or any of the said forms, or any other forms for use in driving

machinery, and for light, heat and all other uses to which the power so supplied can be applied. . . . And the company may acquire, own, hold, sell or otherwise dispose of water power, water privileges in the State of North Carolina, and locate, acquire, construct, equip, maintain and operate all necessary plants for generating and developing by water, steam, or any other means, and for storing, using, transmitting, distributing, selling and developing power, including dams, gates, bridges, sluices, tunnels, stations and other buildings, and all other works, structures, machinery and appliances which may be necessary to operate said plants. . . . Sec. 5. To carry on and conduct the business of generating, making, transmitting, furnishing and selling electricity for the purpose of lighting, heat and power, and transmission of power, and to furnish and sell, and to contract for the furnishing and sale to persons, corporations, towns and cities of electricity. . . . For all uses and purposes for which electricity is now or may be hereafter used. . . . Sec. 6. And, whenever any land for the location of a dam or dams, or of a canal or canals, or for ponding of water, or any other lands or rights of way may be acquired by said company for the purpose of constructing and operating its works, or for conducting the business herein authorized, or any part of said business, and the said company cannot agree with the owner thereof for the purchase of the same, the same may be condemned and taken and appropriated by said company."

The act provides if the power company cannot agree with the owner on a price for the purchase of the land a certain method is set forth to condemn it—commissioners, etc., appointed. The Santeetlah development consists of a reinforced concrete dam about 214 feet high and 1,300 feet across the top opening, down to the width of the river at the bottom. The lake covers an area of about 3,000 acres. It took approximately two years to construct the dam. This dam backs the water over the acre of land in controversy on Snowbird River, a tributary of Cheoah River. The project was completed in 1926 and the land in controversy covered with water. The capacity of the plant is 66,000 horsepower. The testimony of defendant's witnesses was to the effect that the acre of land in 1926 was worth $10.00, $15.00, $30.00 and $100.00 for the acre. The plaintiff's witness, D. B. Burns, was to the effect: "I have an opinion as to its reasonable market value when it was covered with water in 1926, and know the capabilities of this property and the uses for which it is adapted, its reasonable market value was $1,940.00 per acre. This land was valuable as a water-power proposition and in giving my opinion I took into consideration its adaptability for water-power purposes."

It was in evidence that the defendant, since the project was completed, has been selling power to the following public-service corpora-

tions: Tennessee Power Company, Tennessee Electric Company, Carolina Power and Light Company, Nantahala Power Company, Knoxville Power Company, and Aluminum Company of America, at Alcoa.

Part of the time it would be used directly at Knoxville, and other times it would supply the area between Chattanooga, Knoxville and Alcoa. Served the territory all the way from Knoxville to Chattanooga. The Carolina Power and Light Company serves Newport, Asheville, Kingsport, and Knoxville. The Nantahala Power and Light Company serves Balsam Mountain and Murphy, and supplies the following towns: Franklin, Andrews, Tapoco, Robbinsville, and Marble. It supplies a large manufacturing plant in the vicinity of Sylva, but does not supply the town. Defendant sells about 20 per cent of the output to the Tennessee Electric Company; about 20 per cent to the Carolina Power and Light Company; between 1 and 5 per cent to Nantahala Power and Light Company; from 1 to 5 per cent to Knoxville Power Company; and the balance to the Aluminum Company of America at its plant in Alcoa.

The plaintiff's witness, D. B. Burns, further testified, in part: "I don't know how many acres of land was sold to Tallassee Power Company, now Carolina Aluminum Company, in the Santeetlah reservoir; I would guess around 50 acres. They took a deed. The land is now covered by water. We sold it at ten dollars an acre under the terms of the contract. . . . I assumed when we sold it they were to cover it with water. It was so stated in the contract."

J. E. S. Thorpe testified for defendant, in part: "I had a conversation with D. B. Burns in regard to the purchase of this acre of land. It was in 1930, after I moved to Bryson City." Witness was asked the question: "What was the conversation about this acre?" Witness answered: "I asked Mr. Burns why he was making so much to do with this small area in the Santeetlah basin, and he said he agreed," . . . "He said it did look trivial to him, too. I said, why don't you sell it to the company at a fair price. You know what land sells for in that section. He said, no, I won't sell it until we reach an agreement for all the Tennessee River with your company, that is, Nantahala Power and Light Company, and says, I am holding it over your head. I said that I thought this was an unethical position to maintain, and that I thought I could arrange an agreement. He said not only your company lands, but over on the Tennessee River. He placed it beyond the pale of anything."

The first question: Was defendant a public-service corporation and serving the public, and did the defendant have the right of eminent domain? We think so. The charter gave it all rights, privileges, and powers of a public-service corporation. The evidence was to the effect

that it was carrying out the purposes of its charter and generating and selling electricity. This power of eminent domain to such a corporation has long been the public policy of the State. N. C. Code, 1931 (Michie), sec. 1705, is as follows:. "For the purposes of this chapter, unless the context clearly indicates the contrary, the word 'corporation' includes the bodies politic and natural persons, enumerated in the following section, which possess the power of eminent domain."

Section 1706: "The right of eminent domain may, under the provisions of this chapter, be exercised for the purpose of constructing their roads, canals, lines of wires, or other works, which are authorized by law and which involve a public use or benefit, by the bodies politic, corporation, or persons following: (1) Railroads, street railroads, plank road, tramroad, turnpike, canal, telegraph, telephone, electric power or lighting, public water supply, flume or incorporated bridge companies. (2) Municipalities operating water systems and sewer systems and all water companies, operating under charter from the State or license from municipalities, which may maintain public water supplies, for the purpose of acquiring and maintaining such supplies. (3) Persons operating or desiring to operate electric light plants, for the purpose of constructing and erecting wires or other necessary things," etc.

In *Land Co. v. Traction Co.,* 162 N. C., 314 (315), it is said: "The plaintiff contends that the Piedmont Traction Company cannot exercise the power of eminent domain because under its charter it is authorized to engage in private business in addition to its authority to operate a street railway, which is a *quasi*-public business. We think the law is clearly stated thus in 15 Cyc., 579: 'But the fact that the charter powers of the corporation, to which the power of eminent domain has been delegated, embrace both private purposes and public uses does not deprive it of the right of eminent domain in the promotion of the public uses.' The traction company has the power of eminent domain, not only by virtue of its charter, but by Revisal, secs. 1138 and 2575; *Street R. R. Company v. R. R.,* 142 N. C., 423."

Plaintiff in its brief states the law thus: "The law of the land, in this relation here, is that private property cannot be taken for private use, with or without compensation, without the consent of the owner, and can never be taken under the power of eminent domain, except for public use and upon payment of just compensation."

The relation here is not private use, but defendant is a public-service corporation, serving the public. See chapter 32, Electric, Telegraph, and Power Companies. Also, see *Brown v. Mobley,* 192 N. C., 470. The right of eminent domain to these public-service corporations makes them amenable to State control. The State can control a public-service corporation, and has done so. (Michie), *supra,* sec. 1035, is as follows:

"The Corporation Commission shall have such general control and supervision as is necessary to carry into effect the provisions of this chapter and the laws regulating the companies, corporations, copartnerships, and individuals specified herein, over—(1) railroads, etc., (2) telegraph and telephone companies, etc., (3) electric light, power, water and gas companies and corporations, other than such as are municipally owned or conducted, and over all persons, companies, and corporations other than municipal corporations now or hereafter engaged in furnishing electricity, electric light, current, or power and gas. (4) All water power, hydroelectric power, and water companies now doing business in this State, or which may hereafter engage in doing business in this State, whether organized under the general or private laws of this State or under the laws of any other state or country. Such companies are deemed to be public-service companies and subject to the laws of this State regulating public-service corporations," etc.

The right of the State to establish regulations for public-service corporations, and over business enterprises in which the owners, corporate or individual, have devoted their property to a public use, and to enforce these regulations by appropriate penalties, is now and has long been too firmly established to require or permit discussion. *Corporation Commission v. Mfg. Co.,* 185 N. C., 17.

The second question: Did the defendant have the right in this action to have permanent damages assessed under its power of eminent domain for its permanent trespass on the lands of the plaintiff by the impounding of its lake with a permanent structure? We think so.

The serious question presented is the position taken by plaintiff that defendant did not pursue the method set out in its charter to have this land condemned? We think on this record this position cannot be sustained by plaintiff. The land was in dispute. The defendant had the land flooded since 1926. The plaintiff knew of this, and to its agent, Burns, said: "It did look trivial to him, too. . . . No, I won't sell it until we reach an agreement for all the Tennessee River with your company. . . . I am holding it over your head." The land was originally contracted to defendant for $10.00 an acre, but the time limit to purchase had expired. This witness at the trial testified it was worth $1,940.00. This action was commenced by plaintiff 19 May, 1932. Plaintiff stood by for six years and saw this acre flooded, refused to sell it to defendant. We think that when defendant in its answer prayed that if it did not own the acre of land that the same be condemned and permanent damages assessed in the action, it was incumbent on plaintiff, if it wanted the remedy pursued under defendant's charter, it should have so requested. On the contrary, it prayed for $4,000 damages, it ac-

quiesced in the jury trial by submitting issues and doing other things which it is now estopped to complain of.

In 10 R. C. L. (Eminent Domain), p. 230, part sec. 194, is the following: "It is well settled that an owner of land who knowingly allows an expensive public improvement to be erected upon his land without proper condemnation proceedings, waives his right to object to the validity of the taking, and even when he is constitutionally entitled to compensation in advance, he is in such case estopped from asking for an injunction against the continued occupation of his land, or from attempting to require possession by writ of entry or ejectment proceedings. Furthermore, an owner who has so acted may himself be enjoined from attempting forcibly to remove or destroy the works that have been constructed upon his land. In certain cases, however, the rule has no application, as, for example, where a dam was properly constructed upon land acquired for the purpose and where as a consequence not anticipated by the owner it effected a flooding of land not taken. When the only ground for complaint is that compensation has not been paid in advance, an owner who allows the work to be constructed without objection cannot treat the taking as unlawful, even to the extent of bringing a common-law action of trespass, if there is a statutory proceeding available for the ascertainment of damages. The fact that a landowner stands by and acquiesces in or even consents to the appropriation of his land for public use does not, however, amount to a waiver on his part of his right to claim compensation for the land taken and the damage inflicted."

In *Rouse v. Kinston,* 188 N. C., 1 (11), speaking to the subject: "We think the principle in *Keener v. Asheville,* 177 N. C., 4, applicable. It is there said: 'In this view, the present case, we think, comes clearly within the recent decision of *Mason v. Durham,* 175 N. C., 638. There the county commissioners, in straightening a public road, had taken a strip of plaintiff's land. In an action to recover damages, defendants denied plaintiff's ownership of the land and, generally, his right of action, and on the hearing resisted recovery for the reason, among others, that plaintiff's remedy was in petition to the board of commissioners, as the statute provided, and it was held, among other things: 'The county board of commissioners, in acting upon a petition by the injured owner whose land had been taken for road purposes under a statute providing for the assessment of damages by this method, does so in an administrative capacity; and where the board has taken and is using the land for such purposes, *and the owner has not followed the special method provided and brings his action in the Superior Court for his damages, the defendant's denial of plaintiff's ownership and its liability for the damages waives its right to insist that the statutory method should have*

*been pursued by the plaintiff.'* "    (Italics ours.)    *Fleming v. Congleton,* 177 N. C., 186; *Efird v. City of Winston-Salem,* 199 N. C., 33.    The statutory remedy against the State Highway Commission (a State agency) for taking land under the act is exclusive.    *Long v. Randleman,* 199 N. C., 344.

The court below charged the jury: "In actions of this kind, our Court has laid down the following rule as to the measure of damages: The Supreme Court says that it is too well settled that when for the purposes of meeting and providing for a public necessity the citizen is compelled to sell his property, or permit it to be subjected to a temporary or permanent burden, he is entitled by way of compensation to its actual market value.    The difficulty arises not so much in fixing the standard of the right as in ascertaining what elements or factors may be shown in applying the standard.    Certainly where by compulsory process and for the public good the State invades and takes the property of its citizens, in the exercise of its highest prerogative in respect to property, it should pay to him full compensation.    The highest authorities are to that effect.    The market value of property is the price which it will bring when it is offered for sale by one who desires but is not obliged to sell it, and is bought by one who is under no necessity of having it.    In estimating its value all the capabilities may be applied for which it is adapted may be considered, and not merely the condition it is in at the time and the use to which it is then applied by the owner."

This charge is fully in accord with the authorities in this jurisdiction. *Power Co. v. Power Co.,* 186 N. C., 179 (183); *Power Co. v. Hayes,* 193 N. C., 104 (107); *S. v. Lumber Co.,* 199 N. C., 199.

We see no error in the court's overruling plaintiff's demurrers.    The plaintiff's exceptions and assignments of error as to the evidence introduced by defendant cannot be sustained.    The issues submitted by the court below were determinative of the controversy, and we see no error in submitting them.    We see no error in the charge or as to the burden of the issue.    We see no prejudicial or reversible error on the record and the many exceptions and assignments of error on the part of the plaintiff cannot be sustained.    From the evidence, the jury awarded plaintiff full damage for its one acre of land, which originally plaintiff contracted to sell for $10.00 an acre, but the time limit had expired and the jury fixed the damage at $350.00 for the acre.

We see in the judgment of the court below

No error.